## Ronick v. Lynn

*John E. Costello,* for petitioners.
*Paul E. Moses,* for defendant.

TERPUTAC,*J.,* September 28, 1982—There is no pellucid explanation for the type of litigation before the court. This case involves the attempt by one side of the family filing suit to compel the disinterment of the body of a young man killed in an untoward vehicle accident and to cause his body to be reinterred in another burial plot in the same cemetery; it concerns the unflinching opposition of the other side of the family seeking to prevent reinterment; and it places the court in the unenviable position of trying to determine what course we should take. On the one side of the family are arrayed those who believe that the body should be disinterred for the reasons they have expressed; on the other side are aligned those who steadfastly hold that the body should lie in peace undisturbed. Regrettably, the testimony, depending upon which side the witness was allied, was fraught with accusations of improper motives, with lack of concern for the dead, with remarks respecting who might have loved decedent more, and with a multitude of other carping statements which ineluctably shed little light upon the basic issues. The protean quality of the testimony was only exceeded by the bitterness which permeated the courtroom.

Decedent who is involved in this matter is John R. Ronick, Jr., a young man who at the age of 23 years met an untimely and tragic death on January 1, 1982, in a vehicular accident. His mother, Joanne S. Lynn, defendant herein, made the funeral arrangements. The body was interred in the Mon-

ongahela Valley Memorial Cemetery in a plot owned by Mrs. Lynn's husband's parents. It was not until July 12, 1982, that a petition was presented to the orphans' court division on behalf of John R. Ronick, Sr., natural father of the young man; Nancy Ronick Milinovich, sister of decedent; John and Alma Sedell, maternal grandparents; and Mary Ann Miller, his fiancee. Miss Miller and the young man had become engaged to marry shortly prior to his death. Petitioners averred that during his lifetime John (for the purposes of clarity we shall refer to the young man as John, the name his loved ones preferred) had expressed his wishes to his maternal grandparents that he be buried in case of his death with his maternal grandfather and not in the Lynn plot. Furthermore, petitioners stated that during the burial process the body of John was buried in the same grave plot with the body of a baby who had died some years ago, the baby having been the child of Mrs. Lynn, so that the baby was a half-brother of John. Petitioners object strenuously that John's body was somehow improperly buried in the plot with the body of the baby, and that the baby's vault was placed atop the vault which contained John's body, but at the feet of John's body, so to speak. Accordingly, petitioners request that the court order the disinterment of John's body and reinterment in another portion of the same cemetery at a "more desirable location on top of the hill."[1]

In defense, defendant, John's natural mother, asserts that all petitioners with the exception of John R. Ronick, Sr., the natural father of John and former husband of Mrs. Lynn, have no standing as

---

1. Jurisdiction in the orphans' court division is predicated upon section 711(1) of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. §711(1).

petitioners. Her second line of defense concerns waiver. Mrs. Lynn claims that since most if not all of the petitioners knew about some or all of the funeral arrangements, they should be deemed to have waived their rights to seek disinterment since no one objected until over a month had elapsed from the time of the obsequies.

After a careful consideration of the law and the facts, we must rule in favor of the natural mother, Joanne S. Lynn. Most of the law in Pennsylvania respecting rights of burial are posited upon Pettigrew v. Pettigrew, 207 Pa. 313, 56 Atl. 878 (1904). There the Supreme Court said:

"The result of a full examination of the subject is that there is no universal rule applicable alike to all cases, but each case must be considered in equity on its own merits having due regard to the interests of the public, the wishes of the decedent and the rights and feelings of those entitled to be heard by reason of relationship or association."

In analyzing the rights of the various interested parties, the Pettigrew court stated:

"Secondly, if there is no surviving husband or wife, the right of the next of kin in order of their relation to the decedent, as children of proper age, parents, brothers and sisters, or more distant kin, modified it may be by circumstances of special intimacy or association with the decedent." Id.

Without more, it would appear that the right and responsibility to make the burial decisions should be vested with John's mother: In Re Knox Burial, 21 Fid. Rep. 448 (1970). We hold that since all the petitioners, except Mary Ann Miller, were related to the decedent in varying degrees, they have standing to bring suit under the principles advanced in Novelli

v. Carroll, 278 Pa. Superior Ct. 141, 420 A. 2d 469 (1980).[2] Although Mary Ann Miller may have some slight standing, it is quite remote for the relatives themselves have primary standing to seek reinterment. As to waiver, the mere passage of time—in this case, a rather short period—did not operate to effect a waiver of the petitioners' rights. There appeared to be some element of consent, at the least implied, respecting the burial arrangements by those who now seek reinterment. Normal grief by itself does not vitiate consent: Datz v. Dougherty, 41 Pa. D. & C. 505 (1941). For the reasons discussed herein, the court is satisfied that the doctrine of waiver does not bar the rights of petitioners.

In cases of reinterment there is a general presumption that decedent would not want his remains disturbed: Novelli v. Carroll, supra. This presumption grows stronger as the connection with the decedent becomes more remote: Pettigrew v. Pettigrew, supra. Pennsylvania does not follow the jurisdictions which deny reinterment unless exceptional cause may be shown; rather principles on reinterment are based upon the reasonable cause doctrine: Novelli v. Carroll, supra. In this respect the court is obliged to consider several factors to decide whether reasonable cause exists or does not exist. We now turn to the consideration of these factors as they pertain to the evidence adduced.

As much as the issue of credibility and weight of the evidence may trouble the court in non-jury cases, since these questions are often so intertwined with

---

2. In Novelli, Judge Spaeth speaks about the "degree of relationship that the party seeking reinterment bears to the decedent" and that in some cases a "stranger may have a strong interest in preventing reinterment." 278 Pa. Superior Ct. at 148, 149, 420 A. 2d at 472, 473 (1980).

the demeanor of the witnesses, their motives, secret wishes, dislikes and foibles, yet it must necessarily fall upon the judge the difficult sometimes recondite task of assessing the validity of the testimony. After careful deliberation, we are constrained to resolve the issues of credibility and weight of the evidence in favor of defendant. The indurate attitude of the contesting parties has not mitigated our task.

We first consider the relationship and the strength of that relationship as that subject bears to the decedent by the parties seeking reinterment. As we view it, the primary party who should be allowed the rights and privileges of deciding funeral arrangements should be John's mother. His father, John R. Ronick, Sr., should be entitled to the same status except that it was generally conceded that John and his father were never really close. Although John was 23 years of age, he had lived most of his life, as a child and an adult, with his mother. His mother and father, Joanne S. Lynn and John R. Ronick, Sr., were divorced in the early 1960's. At that time Mr. Ronick had left his wife Joanne, and the children remained for a time with Joanne's parents. Even though the relationship was strained, we find that John and his father became a little closer in the past two years. To his credit Mr. Ronick did provide some support to John and Nancy. We find that Mrs. Lynn's wishes in the matter are far superior to that of Mr. Ronick.

John was close to his sister Nancy, an admirable situation in this age of deteriorating family relationships. Nancy testified she did not know about John's wishes that he did not want to be buried in the Lynn plot until over a month after the funeral. She is the beneficiary of John's life insurance policy, and she and Mary Ann Miller have joint claims on

John's pension plan. After she learned about John's burial wishes expressed to his maternal grndparents, Nancy wrote to her mother stating that John's body should be disinterred and reburied in another plot for which she would pay all expenses. It is apparent that there is a strained relationship between Nancy and her own mother. With understandable concern, Nancy wishes to have John buried in his own plot and not in the Lynn plot which he shares with the baby half brother. However, we find Nancy initially agreed to the burial plans made by her mother for John. She did not object, according to her testimony, because she was in a state of grief and shock.

The maternal grandparents, Mr. and Mrs. John Sedell, have an interest and standing in this suit. They testified that John, during certain phases of despondency, said to them he did not wish to be buried "down over the hill" in the Lynn plot but that he would prefer to be buried with the Sedell family. The Sedells were loving grandparents, providing John with financial help. Mrs. Sedell testified she did not know at the time of the funeral where John would be buried, but she failed to advise anyone at that time about John's desires. The Sedells object to John's burial in the Lynn plot. After John's death, Mrs. Sedell visited her daughter Joanne and offered some financial help with the funeral but Joanne declined to accept.

John's father, John Ronick, Sr., had not been consulted about the funeral arrangements. He admitted he had left his family in the early 1960's when the children were placed with Mrs. Sedell. In the past two years he had become better acquainted with John but there had been no real contact for many years.

Much of the testimony centered upon the rather strained relationship between John and his step-

father, Rodney Lynn. John's fiancee, Mary Ann Miller, testified there was a hateful feeling by John toward Mr. Lynn, that John spent most of his free time away from college at her home where she resides with her mother, and that John had told her he did not wish to be buried in the Lynn plot. Miss Miller knew about the funeral but did not know where John would be interred.

Weighing these factors we find them in favor of the respondent, John's natural mother, who has over the years shown her love and devotion to him. This leads us to the second factor: Mrs. Lynn's strong desire to prevent reinterment. No rule or regulation of the cemetery has been brought to the attention of the court which might militate against reinterment. Therefore, the issue is how strong Mrs. Lynn's relationship was with her son and how that relationship bears in her seeking to prevent reinterment. We find that although it might have been morally wiser for Mrs. Lynn to have consulted with other relatives, she was not legally obliged to do so. We find she acted in good faith. In this respect we deem it unfortunate that she and her own parents are on opposite sides of this litigation.

The third factor is the desires of decedent. Obviously, the testimony is conflicting. Assuming the statement of John that he did not wish to be buried in the Lynn plot is true, that desire was not conveyed to his own mother and to his sister Nancy, the two persons with whom he was very close. We note that the issue of his desires respecting burial did not arise until over a month after the funeral when the Sedells had related the information to other members of the family and after the insurance money had been paid. In this respect we think the testimony of Nancy is crucial. She had no knowledge of that wish until after the information was related to her

by the grandparents some time after the funeral. We have carefully reviewed the testimony and we find that John's wishes were not expressly related and that if such language had been used it was too indefinite to be accorded any weight.

The fourth factor concerns the conduct of those seeking reinterment and those persons desiring to prevent reinterment. Unfortunately, much of the testimony focused on Rodney Lynn, the husband of defendant. He has been depicted on one hand as a man who helped rear John to manhood in his own home, who took John hunting, and who got along fairly well with John even though John was a stepson; on the other hand he is pictured as a hateful person who is parsimonious with his money and who made it virtually impossible for John to reside in his home. We believe all the testimony has little or nothing to do with the issues germane to this case. Nobody has testified Rodney had anything to do with the decisions respecting burial, except that he allowed the Lynn plot to be used. We find that the decisions were made by John's mother and we attribute no improper motives to her or to Mr. Lynn. Moreover, Mrs. Lynn did nothing to mislead the other members of the family nor did she engage in misrepresentations in an effort to frustrate their wishes. No one has sought to deny to any persons the right to visit the grave site.

The length of time factor has been discussed. Although we do not think the length of time between burial and action to seek reinterment is unduly long, the length here involved seems to be in favor of the party denying reinterment. We believe also that the petitioners are not acting out of motives in order to harass, yet we think it is somewhat critical that their dislike for Mr. Lynn has substantially influenced their emotional state. Even if the hill-

side plot is not as suitable as a plot on the hillock itself, the court is of the opinion that no testimony of sufficient weight has been introduced to show that the present site is dangerous or manifestly unsuitable.

In summary, taking into consideraiton all the factors, weighing them as we must, and appraising them as they bear upon each other, we hold that the petitioners have failed to sustain their burden of proof to show reasonable cause for reinterment. In this type of emotionally charged litigation, the court must weigh the factors for and against reinterment with legal reasoning and sound temperament and we should advise the litigants to put aside their feelings of hatred and frustration so that this young man's body may rest in peace. In support of the adjudication, we shall allow the friends and relatives of John R. Ronick, Jr., the rights and privileges to visit the burial site without restriction but in accordance with cemetery rules. We shall furthermore make an appropriate order respecting a monument or gravemarker.

## DECREE NISI

And now, September 28, 1982, the prayers of the petition seeking reinterment of the body of John R. Ronick, Jr., are denied and the petition is dismissed.

Subject to the rules and regulations of the cemetery, all relatives and friends of John R. Ronick, Jr., shall have the right to visit the burial site. A suitable gravemarker or monument shall be erected at the grave site with such inscription as the natural mother, Joanne S. Lynn, and the sister, Nancy Ronick Milinovich, shall agree, except that it must contain the names of both natural parents.

The court shall retain jurisdiction for the limited purpose of ascertaining that this decree is carried

out. After the gravemarker or monument has been selected and installed, counsel shall report to the court and the court shall consider whether this decree will be made final.